UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MILNER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:19-CV-02166 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ROOSEVELT YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Anthony Milner is a pretrial detainee at the Cook County Jail. He is suing Roosevelt Young,[1] a Jail correctional officer, for allegedly failing to protect Milner from an attack by other detainees in early 2019. That failure to protect, Milner alleges, violated his Eighth and Fourteenth Amendment rights.[2] R. 11, Complaint.[3] In response, Young early on asserted the defense of failure to exhaust administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e; *see* R. 15, Answer, at 2; R. 17. After the Court recruited *pro bono* counsel for Milner, R. 17, and after a period of discovery limited to the exhaustion defense, Young has moved for summary judgment, R. 49, Def. Br. For the reasons discussed in this Opinion, Young's motion is granted.

---

[1]Young's first name is listed as Roosevelt on the defense counsel's attorney-appearance form, R. 14, but somehow does not seem to appear in any other part of the summary judgment records (not even his deposition transcript, R. 50-10).

[2]This Court has subject matter jurisdiction over this federal civil rights lawsuit under 28 U.S.C. § 1331.

[3]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number if applicable.

## I. Background

In deciding Young's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Anthony Milner has been in pretrial detention at the Cook County Jail since August 2018. Compl. at 2; R. 50-11, Booking Card. On January 21, 2019, Milner was housed in Division 11 of the Jail. R. 50-4, Milner Dep. 29:24–30:15; R. 50-5, Grievance Form. Milner claims that, at some point during that day, he told Officer Young that he, Milner, was not safe in Division 11, because several of his enemies were also housed there and might try to kill him. Compl. at 4. Milner says that, even after he shared this concern with Young, the officer left him in the day room with these enemies. *Id.* On that same day, Milner was "jumped" by more than two other detainees. Milner Dep. 29:14–16; Grievance Form. Milner alleges that Young was on duty and "watched it happen," not intervening until the attack had ended. Grievance Form; Compl. at 4. Then Milner was taken back to his cell, where he claims he was denied medical attention. Grievance Form.

Because the issue at hand involves the Jail's administrative-remedy system, a look into that system is needed. Cook County Jail has an established grievance process to address inmate complaints about the conditions of their confinement. R. 50, Defendant's Statement of Material Facts (DSOF) ¶ 7; R. 50-7, Inmate Handbook Excerpt. When Milner entered the Jail in August 2018, he was given a copy of the Cook County Department of Corrections Inmate Information Handbook, which describes the grievance process. DSOF ¶ 7; R. 50-1, Pl. Resp. to Req. for Adm. (RFA) at 1

(response to RFA No. 2). An inmate's first step in the grievance process is to complete and file an Inmate Grievance Form—the filing must take place within 15 days of the underlying incident. Handbook Excerpt at 30–31. The form itself includes an explanation of the grievance process. DSOF ¶ 9; Grievance Form. Inmates file their grievances by handing them to a Correctional Rehabilitation Worker (a job title commonly known by its acronym, CRW). R. 50-12, Mueller Dep. 31:21–23, 33:8–11. The CRW reviews each grievance form to ensure that it complies with the grievance process rules. DSOF ¶ 15. Then the CRW categorizes each grievance as one of three types: an Emergency Grievance, a Standard Grievance, or a Non-Compliant Grievance. Mueller Dep. 34:8–11. In the latter category, a grievance form may be marked non-compliant for various reasons, including that it tries to complain about multiple issues instead of just one. DSOF ¶ 17; Handbook Excerpt at 31. If the Jail's staff marks a grievance form as non-compliant, then the staff member must return it to the inmate with an explanation of why it is non-compliant. Handbook Excerpt at 31. A Non-Compliant Grievance cannot be appealed. DSOF ¶ 29; Handbook Excerpt at 31; Mueller Dep. 49:13–14. If the CRW processes an inmate's grievance form as a Standard Grievance, then it will be forwarded to the appropriate department for a response, which is typically provided to the inmate within 15 days. Mueller Dep. 45:4–7. If the inmate is dissatisfied with the response to a Standard Grievance, then the inmate may appeal the response; indeed, an appeal is *required* to exhaust administrative remedies. DSOF ¶ 28; Handbook Excerpt at 31.

After being attacked on January 21, 2019, Milner filed a grievance on February 1 by giving it to CRW Gary Lewanski.[4] Grievance Form; Mueller Dep. 13:15–17. On the form, Milner wrote (in something of a run-on sentence) that "on January 21st I got [j]umped on by more than 2 people in front of my staff on DJ name young he watched it happen[e]d and when I got to the holding cell they denied me medical." Grievance Form. That same day, February 1, Lewanski reviewed the grievance with Lewanski's supervisor, Lester Hampton. R. 50-25, Lewanski Dep. 14:7–21; Mueller Dep. 8:21–22. Lewanski brought the form to Hampton because Lewanski thought that the grievance raised multiple issues (the failure to protect plus the denial of medical treatment), so it might need to be processed as Non-Compliant; Hampton agreed. Lewanski Dep. 15:18–20, 16:6–11, 17:1–4. After conferring with Hampton, Lewanski returned the form to Milner along with a Non-Compliant Grievance Response Form. Lewanski Dep. 16:9–11; R. 50-6, Grievance Response. The parties diverge on the specifics of the discussion between Lewanski and Miller. In Lewanski's deposition, he testified that he verbally reviewed the information on the Non-Compliant Grievance Response Form with Milner. Lewanski Dep. 20:18–21:7. On that response form, in the section giving the reason for noncompliance, Lewanski checked and initialed a line that says, "The grievance form contains more than one issue." Grievance Response. Lewanski further wrote, in the comments section: "See grievance policy stated above. The grievance form contains more than one issue. Inmate

---

[4]In its briefing, the defense insists that Milner did not "file" a grievance. R. 49, Def. Br.at 7 This is a semantically odd way of characterizing the grievance that impedes the analysis. The reality is that Milner "filed" a grievance, even it was later *processed* as non-compliant.

4

advised to separate his issues and CIID will be notified regarding your security related concern. Div. 9 Dispensary will be notified and you are advised to use the medical health care form as well." *Id.* Milner signed the bottom of the form to acknowledge receipt. Grievance Response; Milner Dep. 35:15–17. In contrast to Lewanski's version of this meeting, Milner testified that the CRW did *not* verbally explain why he was returning the grievance. Milner Dep. 34:24–35:3, 35:15–17. Milner also testified that he did not read the Grievance Response form that Lewanski gave him. *Id.* 35:18–21, 36:5–13. (Milner is a high school graduate and can read and write. DSOF at ¶ 5; Milner Dep. 9:7–12.)

As of February 1 (the date of this Lewanski-Milner meeting), 11 days had passed since the attack on January 21. This meant that Milner had four days left to file a timely, compliant grievance about the failure to protect. Handbook Excerpt at 31; Mueller Dep. 50:1–12; Lewanski Dep. 54:14–24; 61:2–11. But Milner did not file any additional grievances about the January 21 attack or follow up with Jail staff about the February 1 grievance response. DSOF ¶¶ 23–24; Milner Dep. 45:5–20. And Milner does not allege that any Jail staff member prevented him from filing additional grievances.

In March 2019, Milner filed this lawsuit. R. 1. After Young asserted the exhaustion defense, the Court recruited counsel for Milner, R. 17, and the parties engaged in discovery limited to the exhaustion defense, R. 22. Young now moves for summary judgment on exhaustion. R. 48, Def. Mot. Summ. J.

5

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

The Prison Litigation Reform Act (PLRA) prohibits prisoners and detainees from filing suit in federal court to challenge prison or jail conditions "until such administrative remedies as are available are exhausted." 42 U.S.C § 1997e(a). A

detainee must take all the steps required by the prison's grievance system in order to exhaust his administrative remedies. *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004); *Pozo v. McCaughtry*, 286 F.3d 1022, 1023–24 (7th Cir. 2002). In other words, the PLRA "requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Inmates must meet appropriate deadlines and follow "other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91. The only limitation to the exhaustion requirement is baked into the statute: remedies must be "available." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The issue in this case is whether the Cook County Jail's grievance process was fully available to Milner.

## A. Availability

Broadly speaking, there are at least three types of circumstances when a prison or jail's administrative remedy can be deemed unavailable. *Ross*, 136 S. Ct. at 1859. First, if an administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"—then it is not available to inmates. *Id.* Second, if administrative rules are so opaque or confusing that "no reasonable prisoner can use them," then they are not considered available. *Id.* For vagueness to render a remedy unavailable, however, genuine murkiness is required; if administrative rules simply have multiple reasonable interpretations, then "Congress has determined that the inmate should err on the side of exhaustion." *Id.* Third, if prison administrators or staff "thwart inmates from taking advantage of a grievance process," then the process is not available. *Id.* at 1860. This can happen

7

through "affirmative misconduct," such as refusing to provide or respond to grievance forms or threatening inmates with negative consequences for grieving. *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016); *Dale v. Lappin,* 376 F.3d 652, 656 (7th Cir.2004); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Administrators can also relegate a remedy into the depths of unavailability by simply failing to inform inmates of grievance processes, leaving inmates ignorant of the remedy. *Hernandez*, 814 F.3d at 842; *King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015), *overruled on other grounds by Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020). But ignorance of the remedy is not always an excuse for failing to exhaust remedies: "The PLRA does not excuse a failure to exhaust based on a prisoner's ignorance of administrative remedies, so long as the prison has taken reasonable steps to inform the inmates about the required procedures." *Ramirez v. Young*, 906 F.3d 530, 538 (7th Cir. 2018).

Here, no one really disputes that Milner did not complete the administrative-remedy steps established by the Cook County Jail. And everyone agrees that Milner never submitted another grievance form after the first one was deemed a Non-Compliant Grievance, and all agree that Milner never filed an appeal. DSOF ¶ 24; Pl. Resp. to RFAat 3–4 (responses to RFA Nos. 20 and 21). At issue is the *reason* for Milner's failure to complete the administrative steps. Milner blames the failure on the purported unavailability of the grievance process. He makes three separate arguments in casting blame.

8

### 1. Information on Resubmission

First, Milner argues that, after his grievance was returned to him as a Non-Compliant Grievance, he was never told to refile the grievance. R. 57, Pl. Br. at 4–5.[5] In other words, he argues that the Jail's staff failed to tell him that he could fix the Non-Compliant Grievance, so the grievance process was unavailable. *Hernandez*, 814 F.3d at 842. For purposes of this summary judgment evaluation, Milner must be taken at his word that Lewanski did not *orally* explain that Milner could refile the grievance (though Lewanski says that he did explain what to do to Milner). Milner Dep. 35:1–3, 15–17; Lewanski Dep. 20:18–21:7. But there is no dispute that Lewanski handed Milner a *written* Grievance Response form, which stated (via a checkbox) that Milner's grievance was a Non-Compliant Grievance because, in the words of the form, "The grievance form contains more than one issue." Grievance Response. Also, handwritten on the form (in all capital letters) is a repeat of the checkbox text: "THE GRIEVANCE FORM CONTAINS MORE THAN ONE ISSUE." *Id.* The handwritten text goes on to say (still in all capital letters), "INMATE ADVISED TO SEPARATE HIS ISSUES." Grievance Response; Lewanski Dep. 16:9–11. Although Milner received the Grievance Response (he concedes that he did, and his signature appears on the bottom of it), Milner admits that he did not even read it. Milner Dep. 35:18–21, 36:5–13. Had he done so, he would have seen that the form twice reported that his grievance form contained more than one issue, and he likewise would have seen that he was being advised to "separate his issues." Grievance Response.

---

[5] Milner raises this as part of an argument that he exhausted his remedies. But it is really an attack on the availability of those remedies.

In arguing that his failure to read the form is unimportant, Milner contends that he would have been confused by the explanations on the Non-Compliant Grievance Response form. Milner Dep. 25:17–26:19. But if Milner had read the form when he got it and had been confused, then he could have asked Jail staff for help in understanding it. Mueller Dep. 51:11–52:1; Lewanski Dep. 53:10–21. Instead, he did not read it at all, guaranteeing that he would not understand how to fix the Non-Compliant Grievance.

Milner contends that asking questions to clarify confusion would have done no good because Jail staff would not have answered the questions—but he bases this belief on one interaction with one staff member. Milner Dep. 21:13–22:10. Milner also testified that he did not ask anyone to read him the Grievance Response form that he received from Lewanski because Milner is not a "people person." Milner Dep. 39:10–16. This too is not a good enough reason to not ask Jail staff for help. Beyond asking the Jail staff for help, Milner also should have consulted the Inmate Handbook for information about the grievance procedure, where he would have found this explanation: "If your grievance is processed as non-compliant because of one of the reasons above, an explanation will be provided, and if applicable, you may be asked to resubmit." Handbook Excerpt at 31. That is exactly what the Non-Compliant Grievance Response form advised him to do. Grievance Response.

In sum, the Cook County Jail gave Milner the Inmate Handbook, gave him a Non-Compliant Grievance Response form explaining the problem with the first grievance, and had staff available to answer any questions he might ask. DSOF ¶ 7; Pl.

10

Resp. to RFA at 1 (response to RFA Nos. 2 and 3); Mueller Dep. 51:11–52:1; Lewanski Dep. 53:10–21. These are "reasonable steps" calculated to inform an inmate about his rights to use the grievance process, so Milner's purported lack of knowledge that he had to resubmit the form does not excuse him from exhausting the administrative remedy. *Ramirez*, 906 F.3d at 538.[6]

### 2. The Processing of the Grievance

Next, Milner contends that the Jail handled his grievance improperly and thus should not be allowed to raise the exhaustion defense. Pl. Br. at 6. Again, this is essentially an attack on the availability of the grievance process.[7] Milner asserts that the Jail staff made three important mistakes: they failed to process the grievance as an Emergency Grievance; they mistakenly deemed it a Non-Compliant Grievance for raising multiple issues when it really only raised one issue; and the wrong staff members handled the grievance. Pl. Br. at 6. Each of these contentions is flawed.

First, the record does not support Milner's argument that the grievance should have been handled as an Emergency Grievance. As an initial matter, the Jail's

---

[6] Indeed, Milner actually appealed at least one other grievance. On February 1, 2019—the same day that he filed the grievance at issue in this case and received the Non-Compliant Grievance Response form—he appealed a response to an earlier grievance about mail problems. R. 50-8, Milner Grievances and Responses at 8.

[7] Milner frames it slightly differently, almost suggesting that the Defendant's actions create a special circumstance when the exhaustion defense does not apply. The Supreme Court has been clear that there is no "special circumstances" carveout to the exhaustion requirement: "The court below adopted an unwritten 'special circumstances' exception to [42 U.S.C. § 1997e(a)], permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA. But we also underscore that statute's built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Ross*, 136 S. Ct. at 1855. The issues Milner raises are relevant to the Court's consideration of whether the grievance process was available to him.

11

Inmate Handbook advises inmates to report emergencies immediately to Jail staff. R. 50-35, Full Inmate Handbook at 32. If an inmate thinks that the grievance process can effectively resolve the emergency, then he must say on his grievance form that he is experiencing an emergency. *Id.* But Milner did not do that. To the contrary, he wrote the grievance eight days after the underlying attack and handed it in (on February 1) three days after writing it. Grievance Form. In fact, he submitted another grievance about an entirely different issue on January 22, *before* writing or submitting the grievance about the attack on January 21. Milner Grievances and Responses at 5. Also, by the time he filed his grievance about the January 21 attack, Milner already had been moved to a different housing division, which was what he had originally asked for. Milner Dep. 29:21–23. Based on all this, there is no genuine issue (even viewing the evidence in Milner's favor) on whether the Jail staff reasonably decided not to classify the grievance as an emergency.[8]

The record also does not support Milner's contention that exhaustion is excused because the grievance should have been processed as a single-issue grievance. Yes, it is conceivable to interpret the ban against "more than one issue" as not violated

---

[8]To support the argument that his grievance was an emergency, Milner cites an internal Jail document called the CRW Inmate Grievance and Non-Compliant Grievance Coding Guide, R. 50-23. It is true that the Coding Guide says that grievances alleging inmate-on-inmate violence should not be returned for failure to separate issues. *Id.* at 36. But just a few pages later, it also says: "All grievance forms that would 'normally' be classified as an Emergency Grievance but are deemed non-compliant[] are required to be forwarded to the appropriate departments for review and/or investigation." *Id.* at 44. Lewanski followed this procedure: he deemed the grievance non-compliant, but also informed the security-related department ("CIID") and the medical "dispensary." Grievance Response. In any event, there is no suggestion that Milner (or any inmates) have access to this internal Coding Guide, so it does not form any part of the administrative-remedy system for purposes of exhaustion.

12

by grieving about a failure to protect and the ensuing lack of medical treatment. Indeed, at CRW Lewanski's deposition, when asked if the grievance could have been processed as a single-issue grievance, Lewanski answered, "Possibly." Lewanski Dep. 22:8–10. But Lewanski and his supervisor reasonably decided that the failure to protect and the denial of medical care were really separate issues for purposes of the grievance. Lewanski Dep. 15:18–20, 16:6–11, 17:1–4. Director of Inmate Services John Mueller agreed with this assessment. Mueller Dep. 17:19–18:2. From the Jail's perspective, it is reasonable to separate the issues because each issue required a response from a different department of the jail. *See* Grievance Response (listing CIID[9] as addressing the security issue and the medical dispensary as addressing the other); Lewanski Dep. 51:11–18. Milner argues that there is no clear definition in the Inmate Handbook setting forth what constitutes a single issue. Pl. Br. at 7. But in Milner's case, the Jail's staff explicitly told him, in writing, that his grievance raised more than one issue, and that Milner needed to separate them. Grievance Response. If there was any ambiguity in the single-issue rule, Milner had to "err on the side of exhaustion" and refile his grievance. *Ross*, 136 S. Ct. at 1859. The upshot is that the administrative-remedy system was available to Milner based on the written instructions on the Non-Compliant Response Form (which he unfortunately chose not to read).

Milner's final processing-based argument is that the wrong Jail staff reviewed his grievance, arguing that "sworn" officers or supervisors should have handled the

---

[9]CIID is the acronym for the Criminal Investigation Division. Lewanski Dep. 37:13–17.

grievance. Pl. Br. at 8. But that contention too misses the mark. Milner relies on the Cook County Department of Corrections Grievance Procedure, which requires "sworn members" to attempt to address inmate concerns before a grievance is made. Pl. Br. at 8; R. 50-22, CCDOC Inmate Grievance Procedure at 240–41. But Milner did not approach Officer Young—or any other staff member—with the grievance issues before filing the grievance form. The Procedure does also discuss the role of "sworn supervisors" in responding to grievances, but Milner's grievance was deemed non-compliant and was returned to him. Procedure at 240–41; Grievance Response. So the record does not support the notion that the wrong Jail staff members processed the grievance, or for that matter, that the involvement of any other staff member would have made the process more available to him.

Lastly, Milner cites several cases in which inmates defeated exhaustion defenses based on the unavailability of administrative remedies. Pl. Br. at 14. Each of those cases is easily distinguishable from this case. One prisoner wished to complain about the conditions he faced while being transferred from one facility to another. *King*, 781 F.3d at 893. Nobody in the new facility gave him a grievance form, even after he asked for one, and even if they had, it would have been very difficult for him to file the grievance by the deadline. *Id.* at 893–94. The initial jail's timetable for providing and accepting complaints from transferred prisoners made it "practically impossible for transferred prisoners to pursue their grievances about the transfer process." *Id.* at 895. In contrast, Milner had access to grievance forms throughout the fifteen-day period in which he could submit a timely grievance about the January 21,

2019 attack. DSOF ¶ 11; Pl. Resp. to RFA at 2 (response to RFA No. 7). In another case, jail staff outright refused to give grievance forms to the complaining inmate. *Dale*, 376 F.3d at 656. In yet another case, an inmate was being housed in the hospital unit, where he was not told about the grievance procedures or given a copy of the inmate handbook. *Hernandez*, 814 F.3d at 843. In another case, there were issues of fact on whether prison officials had threatened or intimidated the prisoner to prevent him from filing grievances. *Kaba*, 458 F.3d at 686. In contrast to these three cases, Milner admits that he was given the Inmate Handbook upon booking and does not claim that any Jail staff tried to stop him from filing grievances. Pl. Resp. to RFA at 1 (response to RFA No. 2); *id.* at 4 (response to RFA No. 23). On the contrary, staff were available to accept his grievances and would have answered questions if asked. Mueller Dep. 51:11–52:1; Lewanski Dep. 53:10–21.

      The final two cited cases also are different from Milner's case. In *Dole v. Chandler*, 438 F.3d 804 (7th Cir. 2006), administrators lost an inmate's grievance and provided no instructions on how to refile, which led the court to conclude he had exhausted his remedies. *Id.* at 807, 811. Here, Milner's grievance was promptly processed and returned to him with advice on how to refile. Grievance Response. In another case, jail staff gave only English-language materials to an inmate who clearly did not speak or read English well enough to understand them, a form of obstructionism that does not apply to the literate, English-speaking Milner. *Ramirez*, 906 F.3d at 535.

15

Milner decided not to read the Non-Compliant Grievance Response Form that he received or the Inmate Handbook sections on grievance procedures, and unfortunately did not ask Jail staff for help. Milner Dep. 35:18–21, 36:5–13, 38:21–22, 39:10–16, 45:5–20. It was those decisions, not anything that the Jail did, that rendered the administrative process unavailable to him. If anything, this case most closely resembles *Twitty v. McCoskey*, in which the Seventh Circuit upheld a summary judgment in the Jail's favor because there was "no suggestion…of any affirmative misconduct on the part of the jail to prevent Twitty from learning about and pursuing the grievance procedure; as such, he bore the responsibility of taking the appropriate steps to comply with the proper procedure." *Twitty*, 226 F. App'x 594, 596 (7th Cir. 2007) (non-precedential disposition) (cleaned up).[10] As in *Twitty*, here nothing about the Jail's processing rendered the grievance procedure unavailable to Milner.

### 3. Money Damages

Finally, Milner argues that, because he seeks money damages, no administrative remedy was available to him—the Jail procedure does not authorize an award of money damages. Pl. Br. at 10. It is now almost two decades since the Supreme Court rejected this argument. "Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (citing *Booth v. Churner*, 532 U.S. 731, 741

---

[10]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

16

(2001)). The lack of money damages as a potential administrative remedy did not excuse Milner from exhausting what was available. *Booth*, 532 U.S. at 736.

### B. Equitable Estoppel and Waiver

As a backup argument, Milner contends that the doctrines of waiver and equitable estoppel should prevent Young from raising exhaustion as a defense. But this argument is essentially a repackaged version of the argument that the Jail did not follow its own procedures or respond correctly to Milner's grievance. It is no more successful in the new packaging.

For a party to successfully argue equitable estoppel, it must demonstrate three elements: "(1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment" to the party that suffered the misrepresentation. *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002). When invoking equitable estoppel against a government actor, affirmative misconduct must be shown. *Id.* The Seventh Circuit has not yet decided whether equitable estoppel can be applied in a PLRA case. *Kaba*, 458 F.3d at 687. In any event, even if the doctrine does apply, Milner has failed to demonstrate affirmative misconduct on the part of Young or the other Jail staff, for all the reasons discussed earlier in the Opinion.

On waiver, Milner's argument is barely developed and cites no specific case on point. Instead, Milner cites a case setting forth the general standard for waiver under Illinois law—which requires an element of express or implied *intent* to waive a right. Pl. Br. at 12 (citing *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009)). Even if waiver could possibly apply to pre-litigation

17

conduct and to a statutory defense, it is crystal clear that there is no evidence at all suggesting that Young or any other Jail staff ever expressed or implied any intent to forgo the exhaustion defense. With the failure of this final argument, Young is entitled to summary judgment based on Milner's failure to exhaust administrative remedies.

### C. Stay

Milner has one final request: if he is deemed to have failed to exhaust, then the case should be stayed so that he may exhaust and the resume the litigation. In some circumstances—if the prisoner is blameless in failing to exhaust—it might be appropriate to refrain from dismissing an unexhausted complaint and give the prisoner an opportunity to exhaust. *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). But if the failure to exhaust is the prisoner's own fault, a stay should not be issued, and the case must be dismissed. *Id.* In this case, for all the reasons explained earlier in the Opinion, it was Milner who failed to exhaust available remedies, did not read the Non-Compliant Grievance Response Form, and did not ask any Jail staff for help in pursuing the administrative remedies. The request for a stay is denied.[11]

### IV. Conclusion

Young's motion for summary judgment is granted based on the lack of exhaustion. This is a dismissal without prejudice. *See Ford,* 362 F.3d at 401 (holding that "*all* dismissals under § 1997e(a) should be without prejudice" even if "the statute of

---

[11]It is far from clear that a stay would do Milner any good, because almost surely, as of long ago (probably by the time the case was filed on March 28, 2019), his deadline to submit a new grievance form expired.

limitations might provide a good defense" upon refiling). But this is a final, appealable order. *See id.* (citing *Larkin v. Galloway,* 266 F.3d 718, 721 (7th Cir. 2001)). The Court thanks Milner's recruited counsel for their diligent and zealous representation of the Plaintiff. The tracking status hearing of April 9, 2021, is vacated and final judgment shall be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 28, 2021